GARNET ROSE ET AL., APPELLEES, v. BUFFALO AIR SERVICE, A NEBRASKA CORPORATION, ET AL., APPELLANTS.

104 N. W. 2d 431

Filed July 22, 1960.   No. 34703.

*Tye, Worlock & Knapp, Stewart, Stewart & Calkins,* and *Floyd A. Sterns,* for appellants.

*Gibson & Ganz,* for appellees.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

Garnet Rose, Dale Rose, and Lee Willis, the members of a partnership, were engaged in farming operations in Buffalo and Kearney Counties, specializing in the growing of sugar beets and potatoes. In 1957 they leased land owned by Ethel Boasen in the former county. At a suitable time they planted 31½ acres thereof to sugar beets, properly cared for them, and had a good growing crop of sugar beets thereon at the time of the principal event concerned in this litigation. The word "partnership" as used herein includes the members thereof above named. The sugar beets were owned 4/5 by the partnership as tenant and 1/5 by Ethel Boasen, the owner of the land. The sugar beets in August of 1957 became infested with agricultural pests known as webworms and

grasshoppers and the partnership engaged Buffalo Air Service, a corporation conducting an aerial spraying business for the control and prevention of agricultural pests and weeds, for the treatment by it of the sugar beets with a chemical known as Toxaphene by aerial spray, the method of application being a generally accepted practice for the eradication of the named pests from such a crop. Buffalo Air Service is hereafter referred to as air service. The Food Machinery and Chemical Corporation, an appellant herein, hereafter referred to as chemical corporation, was at all times important to this case engaged in the manufacture and sale of insecticides and pesticides. Garnet Rose, one of the members of the partnership, about August 20, 1957, contacted Ted Smith, one of the two stockholders of the air service, hereafter referred to as Smith, and engaged it to spray the crop of sugar beets of the partnership with Toxaphene. Garnet Rose definitely specified Toxaphene because he said he had used it on previous occasions with good results. This was done on Saturday, August 24, 1957. Garnet Rose testified he examined the field the following Monday morning. The beets then showed great evidence of damage. The leaves were generally wilted and flattened out. He checked the field at different times until the time for harvest. The beets never recovered.

Smith, who actually sprayed the field of beets, acting for the air service, had been in that business for 10 years. He was employed by Fred Voigt until 1956 and thereafter acted for the air service, doing all types of agricultural applications. He had used and was familiar with the use of Toxaphene and 2,4-D. The witness had sprayed 40 acres of pasture with 2,4-D Wednesday, August 21, 1957, and did not spray again for a day or so. He then loaded the airplane with a Toxaphene mixture with the intention of spraying the sugar beets of the partnership. The airplane was the one which had been used on August 21, 1957, to spray a pasture with

2,4-D and any residue thereof in the plane had not been eliminated from it after the pasture was sprayed. Smith was on his way to spray the sugar beets when he decided he had not cleaned the airplane since he had used 2,4-D in it to spray the pasture and he went back to the airport and cleaned the airplane. This was probably about August 22, 1957. The practice which the air service uniformly used in attempting to eliminate from the plane any residue of chemicals previously used therein was placing liquid detergent and warm water in the spraying tank of the plane, leaving it there for a limited time, and then spraying the detergent and water from the plane while it was in motion. The tank was thereafter filled with cold water two times and sprayed from it. This method of cleaning the plane had not resulted in any difficulty in the 10 years of spraying experience of Smith. He had used from eight to ten different kinds of chemicals in his experience since 1949. He had used 2,4-D and was familiar with its use and what it would do. The material placed in the airplane before it had been cleaned after spraying the pasture with the intention of spraying the sugar beets of the partnership was drained into a 30-gallon drum and a 5-gallon can at the airport, placed next to the hangar, and it continued there for several months. This material contained the residue of 2,4-D from the aerial spraying of the pasture in which that chemical was used.

The air service had before August 24, 1957, purchased a 55-gallon drum of Toxaphene from William Munroe of Grand Island, a wholesale dealer in agricultural seeds and chemicals. The drum had a label and the trade name of chemical corporation on it. The air service also had a 5-gallon can of Toxaphene, a chemical corporation product, which it secured in a transaction with Fred Voigt in the fall of 1956. It was bought by him in August 1955. It was sealed with a plastic seal and had on it the label and brand name of Niagara which was a chemical division of chemical

corporation. This can was opened by Smith on August 24, 1957, for the first time. He broke the seal that day. This can was represented by the label on it to contain Toxaphene. The morning of August 24, 1957, 5 gallons of Toxaphene were drawn from the 55-gallon drum into a gasoline can which was used by the air service to measure chemicals and it was placed by the airplane which was to be used to spray the sugar beet field of the partnership. The 5 gallons of Toxaphene secured from Fred Voigt after it had been opened were placed near the airplane. Smith left then in another airplane to do some spraying which required probably 20 minutes. It was intended that Gayle Brandt, hereafter referred to as Brandt, would put the contents of the two cans of Toxaphene in the mixing tank while Smith was absent. Brandt did this and then brought the solution up to 31 gallons by adding water. When Smith came back Brandt was gone and the airplane had been unattended for a short time. The gauge on it indicated the amount of the mixture in the tank and it at that time indicated that Brandt had put the chemical and water therein. The plane was ready for spraying. It was taken by Smith and he then sprayed the sugar beet field of the partnership.

The air service got the 55-gallon drum of Toxaphene about 2 months before August 24, 1957, and had used all of its contents in spraying in the regular conduct of its business except the 5 gallons drawn from it on that day. The contents of the drum had been used as Toxaphene as it was labeled and represented when it was purchased and there had never been any complaint or claim of damage from its use. Smith had never had any difficulty in the 10 years he had been engaged in the business of using chemicals for agricultural spraying. The airplane was not cleaned after the spraying of the sugar beets of the partnership but it was used to spray soy beans with Toxaphene which was done successfully without trouble or injury to the crop. The

material used to spray the sugar beets was a Niagara chemical product and only two 5-gallon quantities labeled Toxaphene and water were put in the tank of the plane and the contents thereof were what was sprayed on the sugar beet field of the partnership. The air service used from 150 to 200 gallons of 2,4-D in 1957 and from 250 to 300 gallons of Toxaphene which generally came in 5-gallon containers. The empty containers were placed behind the hangar and hauled away thereafter when there were enough of them to fill a pick-up truck.

After Smith heard the report that the spraying of the sugar beets of the partnership had damaged them he located the 5-gallon Toxaphene can, the contents of which were used in that spraying operation. He found it behind the hangar with about 20 other empty 5-gallon cans. He positively identified it as that particular can. It was an older one and was rusted when the air service got it from Voigt in 1956. The other empty cans were newer than the one in question. Smith and Lavern Van Buskirk sent it 2 days later to the chemical corporation. It was a green can with the trade name of Niagara Toxaphene thereon and the label of the chemical corporation fully described the contents of the can. There was nothing about the can to indicate that it contained any amount of 2,4-D. When Smith recovered the can there was a small amount of liquid in it. This was not disturbed but was left in the can when it was sent to the chemical corporation in the identical condition as when the can was recovered 2 days previously by Smith. There was generally a small amount of the contents of a can used for chemicals that did not pour or drain out when the can was emptied because there was a small recess in the can that had this effect. It was a lot of work to empty completely the contents of one of these cans. Smith said he detected the odor of 2,4-D in the 5-gallon can when he recovered it from behind the hangar. There was no empty 2,4-D can among those

behind the hangar at that time. The odor of 2,4-D, Smith said, is something like ammonia. The odor of Toxaphene is not unusually strong but it is distinctive. The witness could not characterize or associate it with any other odor with which he was familiar. He did not notice any odor or thing that he thought was unusual when he took the airplane and proceeded to and sprayed the sugar beet field of the partnership. He said that when one was subjected to chemicals for a period of time the odor of them is difficult to distinguish one from the other unless there is something quite unusual and a conscious effort is made to do so. The air service stored its various chemicals in the hangar along the north wall which was about 75 feet long. It had to take them in the containers that were available when it ordered them. It had at times as many as a hundred 5-gallon cans of chemicals there at one time, including Toxaphene and 2,4-D, and it had to be diligent and attentive not to get 2,4-D into its Toxaphene.

Smith saw the beets 2 days after they were sprayed. The leaves were wilted and down from what they should have been. He saw them frequently until harvest time. The leaves changed to a darker color until then. There was some slight second growth of leaves on some of the beets but they did not recover from the damage done them by the spraying.

The information concerning the receptacle used to transfer material from the 55-gallon drum to the tank on the airplane August 24, 1957, was that it was an old 5-gallon gasoline can used to measure chemicals by the air service. Brandt, a stockholder of it, put the contents of this can, the contents of the 5-gallon can acquired by the air service from Voigt, and water in the tank of the airplane that day and that was all the material that was in it. As he left the plane in the airport he saw Smith coming into it and there was no one else in that vicinity. Brandt said Dr. Mason stated: " '* * * we will see to it, and we'll take care of it for you' "

and that was why the chemical corporation had the can and everything.

Munroe & Son of Grand Island, wholesaler of agricultural seeds and chemicals and who handled chemical corporation products, employed Lavern Van Buskirk from June 15, 1950, to November 1, 1958. He, acting for his employer, sold chemical corporation's Toxaphene to Fred Voigt who was then the owner and operator of an aerial spraying business in Kearney. When Smith called Lavern Van Buskirk after the beets were damaged, he consulted Doug Nelson, district manager of chemical corporation, for instructions. Lavern Van Buskirk made an investigation and reported to Doug Nelson, sending him the 5-gallon can, specimens of damaged beets and beet tops from the beet field of the partnership, and photographs of the beets in the field. The can was a 5-gallon chemical corporation container with a large label securely fastened thereto bordered in yellow paint. It gave in detail the contents of the container, representing that it was Toxaphene, and instructions for its use. On another part of the can surrounded by a substantial border in large letters was the word "Niagara." The border around the word and the word were painted with yellow paint. In the yellow border above the word "Niagara" were the words "When you buy" and on the border below the word "Niagara" were the words: "You buy protection." Generally Toxaphene and 2,4-D, if a good quality, are very nearly the same color and cannot be distinguished by their color. The container generally had a "batch number" which is put on when it is filled but one could not be found on the can in question. Lavern Van Buskirk examined the can and found no evidence it had been cleaned, washed, or tampered with. The can in evidence (exhibit 1) appeared to be the one sent to the chemical corporation. He delivered chemical corporation products, especially Toxaphene, to Voigt before he sold his aerial spraying business to Smith.

A practicing soils chemist who operated a soils testing laboratory in Kearney since 1956 was asked by the air service to test the soil, the beet tops, and beet roots for any residue of 2,4-D. The specimen beets taken from the ground and brought to his laboratory were not selected or taken from the field by the chemist. An analysis of the composite samples furnished him showed that there was a sufficient quantity of 2,4-D to destroy the crop. He testified that almost any amount of 2,4-D would be injurious to a crop of beets. His tests showed that there was a concentration of 390-some parts per million of 2,4-D over the area from which the samples were given to him. A "part per million" is a definition used in chemistry to determine very small quantities. An exceedingly small quantity of 2,4-D will kill a broad-leafed plant. The quantity of 2,4-D was sufficient to damage the crop of beets very severely.

The sugar beet field of the partnership was under contract with the American Crystal Sugar Company, hereafter designated sugar company. The agricultural superintendent for that company since 1945 testified he had many years of experience working with sugar beets; that every year there was a case when an application of 2,4-D had been made to sugar beets; and that he was constantly on the lookout for it. He noticed the field in question in this case about a week after it was sprayed. He knew when he first entered the field that it had been sprayed with 2,4-D because of its appearance. He could not detect it by odor. He visited the field once each week thereafter and took a specimen of the beets until November 12, 1957. They were analyzed for sugar content, purity, breakdown of sugar cells, and build-up of impurities in the beets. The result was the first sample had about 9 percent of sugar and it decreased until the last sample had about 3.6 percent. The breakdown of sugar cells causes the material in the beet of which sugar is made to deteriorate and the impurities to build up until it is impossible to

extract sugar. This crop had no commercial value. It was a complete loss and the tops were gone and unsafe for feed. The beet roots were completely rotted away. They were damaged to the extent that they were dead within 2 months. There was some small, green growth from the crown of some of the beets but the root system was dead. The amount of 2,4-D applied to the field in this instance, in the opinion of the witness, would have been similar to the amount generally used in spraying weeds. The field was uniformly sprayed except a small portion that showed little damage around the field and near two power poles. This would not have been true if there had been only a small amount of 2,4-D in the spray. In 1957 sugar beets sold for about $13 per ton. The cost of harvesting and delivering the beets from the field of the partnership to the receiving station would have been from $2 to $3 per ton. The contract of the sugar company with the partnership relieved the sugar company from buying the beets if they were exposed to 2,4-D. The sugar company declined to attempt to process the beets even though an offer was suggested to pay the expense of doing so.

A member of the partnership testified that about 20 acres of the field of the sugar beets were planted April 20, 1957, the balance about 2 weeks later, and that there was normal germination. The field was treated to standard fertilization, was under irrigation, and was cultivated four or five times. The beets were thinned and were irrigated after their cultivation. The leaves of the beets were fully matured by the middle of August. The witness was near the field when it was sprayed and was passing it the following day when he detected an odor from the material used in spraying it which he knew was 2,4-D because he had used it many times. He examined the beets and found they had been damaged. The leaves were wilting, falling down, and were some darker than their normal condition. He saw the field of beets frequently until about the middle of Oc-

tober 1957. A week after August 24, 1957, the leaves of the beets were wilted, turned black, and had fallen down. This was uniformly true except some small strips possibly a couple rows wide for a short distance which showed no visible damage. The damaged beets never recovered. There was slight new growth on the crown of some of them. The sugar company notified the witness it would not accept the beets after the field man for the sugar company had examined the field. The partnership was warned not to make use of the beet tops because of danger of poisoning. The witness said the market price of sugar beets in 1957 was about $14 per ton and beet tops were worth $10 per acre. A field of beets near and in all respects similar to the field of the partnership before it was damaged produced 14 tons of beets per acre that year. The work and expense of raising the beets had been done and incurred except harvesting and hauling them which would have amounted to about $2 per ton.

Another member of the partnership who had been raising sugar beets since 1930 testified that in his opinion the field of beets concerned in this case would have produced about 16 tons per acre if it had not been damaged. He estimated the crop as 480 tons of beets and that the beet tops would have had a value of $10 per acre.

Curtis L. Mason of Middleport, New York, was and had been for 7 years manager of technical service of the chemical corporation and as such he handled all technical problems, which were many and extensive, in the sale of Niagara products for that corporation, including technical problems that came up in the field such as the situation that occurred in connection with the sugar beets involved in this case. He qualified for his position by pursuing a college course in agriculture. He majored in agronomy in Texas A & M College, secured a Master's Degree in plant physiology, and thereafter he worked on a joint major of plant physiology and plant pathology in the University of Wisconsin. He served

a period in the Air Force at the conclusion of which he resumed his graduate studies in the University of Illinois, completed them, and was awarded by that institution a Doctor's Degree because of which he is appropriately spoken of as Dr. Curtis L. Mason. These studies covered a period of 9 years exclusive of his term of military service. He is spoken of herein as Mason.

Chemical corporation is engaged in the business of agricultural chemicals exclusive of fertilizer but including insecticides, fungicides, and herbicides. These products are sold throughout the United States, Canada, and Mexico. In 1954, the year the material was produced which was contained in the 5-gallon can secured by air service from Voigt, chemical corporation had 12 plants, a warehouse at each plant, and field warehouses where materials of this type were stored all over the country. The witness first heard of the damage to the sugar beets of the partnership on August 29, 1957, by a telephone communication from Doug Nelson. Mason discussed the matter with Dr. Hagood, a herbicide specialist who is concerned with products that will kill weeds. Mason received the can (exhibit 1) and the beet samples which were transmitted as stated above. He and Dr. Hagood examined the beet specimens and found that they showed very definite characteristics of having been treated with 2,4-D or a similar substance. Mason gave the can to the chief chemist of the chemical corporation and requested him to determine what was in it. A biological assay was made by applying a measured quantity of material taken from the can to tomato plants because this was faster than making a chemical analysis. The result of this was a clear demonstration that there was definitely 2,4-D in the specimen taken from the can.

Mason had a conversation with Smith and Brandt at their office in Kearney October 9, 1957, and they told him of the operation of the spraying of the beets and their activity before and after that. Mason said he did not

tell them that his employer would take care of everything incident to the spraying and the damaging of the beets. He examined the beets in the field the following day and they exhibited definite evidence of having been subjected to an application of 2,4-D. There were leaves on the ground. There was a limited new growth on some of the beets and the witness was of the opinion the beets were not then dead but were unhealthily alive. He also said that the beets were affected with a disease likely to be present when they are in a declining state of vigor. Substantially all the beets in the field were affected. The witness did not know then whose 2,4-D it was or how much of it had been used. When he returned to his office he learned the result of the chemical analysis of the substance in the can. He was in Kearney on December 4, 1957, and told Smith and Brandt that the investigation indicated a concentration of 41.1 percent of 2,4-D, that it was the amine salt 2,4-D, and that that was the strength normally contained in a standard commercial formulation of 2,4-D which would be equal to 4 pounds of actual 2,4-D per gallon. There are many amine salts of 2,4-D and it was not then known which amine the specimen was. Mason told Smith and Brandt that the findings of chemical corporation showed that the remaining contents of the can (exhibit 1) were a 4-pound-per-gallon 2,4-D formulation and that further checking of the effects of 2,4-D upon sugar beets showed quite conclusively that the effects observed on the beets of the partnership were not nearly as severe as would have occurred had 5 gallons of 4-pound 2,4-D been applied to the beets. Smith and Brandt asked Mason what had happened and he told them that he did not know but that their method of cleaning their spraying equipment was not an accepted one for eliminating 2,4-D from a spraying facility and that there were other chances for contamination of the material in their spray tank. He testified how material of a previous spray can remain in the spray equipment of a plane. He said

1 or 2 quarts can remain in such a facility and if 1 gallon of diluted 2,4-D were left in the equipment from a previous spray and 31 gallons of new material not containing 2,4-D were added to it, the resulting 32-gallon mixture would contain 5,170 parts per million of 2,4-D. He explained that 2,4-D can cling to the metal inside the tank and equipment. Mason explained that the spraying equipment of a plane consists of a tank, pump, and connection from the tank to the booms under the wings. The material is mixed in the tank and it is applied by being pumped through the lines, the booms, and the nozzles in the booms. The outlet from the tank is frequently or generally not entirely smooth on top so that all of the material in the tank will not drain out. The booms cannot be completely emptied though the pump is operated long after all the material possible to remove from the tank has been pumped out because the nozzles of a sprayer are generally inserted into the side of the booms and point down. The liquid, of course, gets down to the point where it is level with the outlets to the nozzles, leaving an air space over the top with some liquid in the lower portions of the booms. There is enough space over the top so that the push of the pump will exert pressure over the top of the water and out through the nozzles without eliminating the remaining liquid out of the booms and he estimated the probable amount thereof as from 1 to 2 quarts.

The witness explained "parts per million" by saying that 100 parts per million would be 1 part in 10,000; that 10,000 parts per million would be 1 part per 100; that 1 part per 100 is 1 percent; 10,000 parts per million would be 1 percent; 1,000 parts per million would be 1/10 of 1 percent; 100 parts per million would be 1/100 of 1 percent; and 10 parts per million would result in 1/1,000 of 1 percent. Similarly, then, going back to 1 part per million the result is 1/10,000 of 1 percent or not very much.

He told Smith and Brandt that he did not know how

the 2,4-D got into the mix but he did know from the evidence that there could not have been 5 gallons of 5-pound-per-gallon 2,4-D put into the tank. Mason told the partnership that because of these things chemical corporation could not accept any responsibility for the damage to the beets, that the product of his company was not at fault in causing the damage, and that the owners of the beets should look to the air service for compensation for it.

Chemical corporation manufactures Toxaphene. That is a general name of it. The specific trade name of it is "Toxakil Miscible." Toxaphene is manufactured in 1,000-gallon batches in a steel kettle of 1,300-gallon capacity. When the manufacture is completed the material is drawn off into containers of 55-, 30-, or 5-gallon capacity. This is a carefully supervised operation. The containers are manufactured by Jones & Laughlin Steel Company. The contents of the can in question herein (exhibit 1), which was secured by air service from Voigt, were manufactured in 1954 at Jacksonville, Florida, placed in the can, and sealed. The evidence of the contents is on the can, except the fact that it was sealed which has been established by evidence. The material placed in the can was a part of a 1,000-gallon quantity of Toxaphene made at one time. All of it was disposed of in the regular course of business of the chemical corporation and no complaint was made concerning any of it except that involved in this case. This is the only instance in which it has been claimed that Toxaphene made by the chemical corporation and supplied by it contained 2,4-D. There has been no 2,4-D manufactured at Jacksonville by or for chemical corporation and there has been no 2,4-D used there in the manufacture of any other products by or for it. Chemical corporation has never manufactured 2,4-D. All of the 2,4-D handled by it since 1950 came from Dow Chemical Company of Midland, Michigan, which makes and packages it in yellow steel containers with a purple band around each of which the

can (exhibit 19) is a specimen, and each had a label attached furnished by chemical corporation. The 2,4-D handled by it is made by Dow Chemical Company, packaged by it, and a label of chemical corporation placed thereon by Dow Chemical Company. Dow Chemical Company sells it to chemical corporation packaged in the containers furnished by it with its label placed on the containers. The packages are sold and delivered by chemical corporation in exactly the condition in every respect as they came from the Dow Chemical Company. This procedure has always prevailed.

Mason said it would require from 500 to 1,000 parts per million of 2,4-D to cause the damage the beets of the partnership sustained and that more than that would have killed them. Even as little as 5 parts per million of 2,4-D would have caused the twisting and curling of foliage that the beets in controversy sustained. If 5 gallons of 2,4-D mixed with 5 gallons of Toxaphene and 21 gallons of water, a total of 31 gallons, had been applied to the field of sugar beets, they would have been killed because such a mixture would amount to 77,000 parts per million of 2,4-D in a 31-gallon solution.

Chemical corporation stored Toxaphene and 2,4-D in the same storehouses. Its labels were printed in the same shop. These were sorted by chemical corporation and the ones for Toxaphene containers were sent to the plants making it and the ones for 2,4-D containers were sent to Dow Chemical Company. Mason said there was no instance when chemical corporation had any trouble in getting labels mixed up or placed on the wrong container. He was in a position to know about this and he never heard of an instance of any label of chemical corporation having been placed on the wrong container either as to material or size of the container. He said great care was used about that procedure; and if it ever happened that a label on a 55-gallon drum was printed 5 gallons, that would be changed from 5 to 55. He never heard of an error of that kind or an error of any kind

concerning the products handled by the chemical corporation. He knows it was very careful as to all details and he would be surprised to find such an error. His attention was then called to the label on the can in question (exhibit 1) secured by the air service from Voigt, especially as to the number of gallons it represented the can contained. He then admitted that the label read 55 gallons when it should have been 5 gallons and that that was an error made by the chemical corporation. Mason said the 2,4-D which the corporation secured from Dow Chemical Company was in yellow containers on each of which was a purple band. A 5-gallon can containing Niagara's formulation of amine 2,4-D made in 1955 was produced, shown to the witness, and placed in evidence (exhibit 19). It has no purple band on it. This was another error.

Mason said on cross-examination that he did not deny that the sugar beets were damaged by 2,4-D; that the spraying of them was the cause of damage because somewhere 2,4-D was being carried and was applied to the beets in this particular spray job; or that the air service used Niagara products in the spray mix which was applied to the beets. Mason also conceded that the beets were sprayed and thereby damaged by 2,4-D beyond having any value. The thing he did not agree with was that it was a chemical corporation product that caused the damage. In other words, he contended it was not 2,4-D produced by Dow Chemical Company for his employer which caused the damage.

The chief chemist of the Niagara Division of the chemical corporation opened the can (exhibit 1) about September 4, 1957, after it was received in New York. He removed the contents of it which were about 1¼ ounces. He examined and analyzed a specimen of it and found that the material was not Toxaphene or Toxakil Miscible as stated and represented by the label on the can. He could not find any Toxaphene in the material. He by chemical analysis determined the material taken

from the can was undiluted, full-strength 2,4-D. The witness could not determine that it was Niagara 2,4-D, the product handled by chemical corporation as opposed to 2,4-D produced or supplied by some other company.

A chemist of the central research laboratory of the chemical corporation specializing in infra-red spectroscopy, a method of identifying chemical compounds by their ability to absorb infra-red light, testified that he tested the material furnished him by Dr. Hagood (which was a specimen of the material that was in the can, exhibit 1, in question in this case). He determined it was 2,4-D, more specifically identified as "diethanolamine salt of 2,4-D." He said he also made a test of Dow Chemical Company 2,4-D and that his tests established conclusively that the 2,4-D in the specimen brought to him by Hagood was not the same type of 2,4-D as the Dow Chemical Company 2,4-D which is a Niagara product. Niagara 2,4-D, he testified, is mixed "ethanol and isopropanolamine salts of 2,4-D." It is not the same as diethanolamine which is what the suspect specimen was that came from the empty Toxaphene can (exhibit 1) secured by the partnership from Voigt.

The substance of the cause of action against appellants as alleged by appellees is that they were the owners of a field of sugar beets which was infested with webworms and grasshoppers; that they contracted with the air service on or about August 20, 1957, for it to apply to the field of sugar beets a chemical known as Toxaphene by aerial spray for the purpose of eradication therefrom of the webworms and grasshoppers; that Toxaphene and the described method of application were generally accepted as a proper procedure for the elimination of such pests from growing sugar beets; that the air service to perform its contract with the owners of the sugar beets purchased, for the purpose of spraying the sugar beets, a chemical from chemical corporation represented by it by virtue of a label on each container of the chemical to be Toxaphene; that the chemical was

not as represented but it contained 2,4-D; that about August 24, 1957, air service negligently applied by aerial spray to the growing sugar beets the chemical purchased from the chemical corporation which was other than Toxaphene and which contained 2,4-D, in violation of the contract between the owners of the sugar beets and the air service; that as a result of the negligent application thereof by the air service and the negligent mislabeling and selling of the chemical by the chemical corporation as aforesaid, the sugar beets were destroyed and made wholly valueless; and that the owners thereof were damaged thereby in the amount of $7,030 for which judgment was sought against appellants.

The answer of the air service, so far as is required to be noticed here, denied the claims of appellees except it admitted that it contracted with them to apply Toxaphene to the sugar beets of appellees by aerial spray and that the chemical and the method of application were generally an accepted procedure for the eradication of webworms and grasshoppers from growing sugar beets. The air service also stated therein that about August 24, 1957, it undertook to spray the sugar beets with Toxaphene purchased by it from chemical corporation by placing it in the tank of an airplane and preparing it in accordance with the general practice for spraying a crop of sugar beets for such pests; that it did spray the sugar beets of appellees; that the beets were damaged because thereof by what appeared to be 2,4-D in and upon the beets; that an investigation was made and it was discovered that the container and the contents thereof purchased from chemical corporation by the air service contained 2,4-D; and that any damage caused by the 2,4-D which was in said container labeled as Toxaphene by the chemical corporation and any damage sustained by appellees were caused by the negligence of the chemical corporation and not by any negligence of the air service.

The answer of chemical corporation admitted that in

the latter part of August 1957 the beet crop of appellees did show evidence of the application of the chemical 2,4-D and that chemical corporation was at the times mentioned in the amended petition of appellees engaged in manufacturing and supplying insecticides and pesticides. The answer denied generally the statements of the amended petition of appellees and specially denied that chemical corporation manufactured, packed, sold, supplied, or delivered the chemical 2,4-D in a container mislabeled Toxaphene to any of the parties to this case or anyone else; that air service purchased any chemical from chemical corporation, its employees, agents, or representatives; that any sale of misbranded chemical or container was made to any parties to this case or anyone else; and that chemical corporation misrepresented any chemical purchased by any parties to this action or anyone else. The answer alleged that any damage to the beet crop of appellees was caused by the negligent, careless, and improper application of chemicals by the air service.

The result of the trial was a verdict for appellees against both appellants. A judgment was rendered on the verdict. Each of the appellants filed a motion for judgment notwithstanding the verdict and a motion for new trial, each of which was denied and because thereof error is assigned by each of the appellants.

It is established in the record that the air service sprayed the sugar beets of appellees with a chemical manufactured or supplied by chemical corporation mixed with water; that there was 2,4-D in the solution sprayed on the beets by the air service; that 2,4-D is harmful to sugar beets; and that it was the cause of the destruction and loss of them and thereby appellees sustained damage. The manager of technical service of chemical corporation and its principal witness at the trial conceded that the sugar beets were damaged by 2,4-D beyond having any value; conceded that 2,4-D was applied to the beets when they were sprayed; and he did not deny

that the air service used chemical corporation products in the spray mix which was applied to the beets. Chemical corporation by its answer disclaimed any negligence on its part and asserted that the damage to the beets was caused by the negligent and improper application of chemicals thereto by the air service. Chemical corporation in its brief concludes that the only explanation the evidence will support is that the 2,4-D came from the air service's spraying equipment or measuring can. Air sirvice by its pleading denied any negligence by it in the spraying of the sugar beets and asserted that the damage to them was caused by the presence of 2,4-D in the container supplied by chemical corporation which was labeled Toxaphene; and alleged that the damage of appellees was caused by the negligence of chemical corporation.

Hickman v. Parks Constr. Co., 162 Neb. 461, 76 N. W. 2d 403, 62 A. L. R. 2d 1040, declares: "The general rule which governs where a party is responsible for a dangerous place, agency, instrumentality, or operation likely to cause injury or damage to persons or property rightfully in its proximity is that he is charged with the duty of taking suitable precautions to avoid injury or damage to such person or property, and his failure to take such precautions is negligence."

Driekosen v. Black, Sivalls & Bryson, 158 Neb. 531, 64 N. W. 2d 88, states: "A vendor and the manufacturer or supplier of a chattel who know or have reason to know that it is likely to be dangerous when used and which is purchased as safe for use in good faith reliance upon their professions or representations of safety, competence, and care, are subject to liability to the purchaser or to others whom they should expect to share in or be in the vicinity of its use, for damages proximately caused by their failure to exercise reasonable competence and care to supply the chattel in a condition safe for use."

Restatement, Torts, § 395, p. 1073, states the law in this

manner: "A manufacturer who fails to exercise rea-sonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by its lawful use in a manner and for a purpose for which it is manufactured." Following the above on page 1074 is Comment a, which states: "As heretofore pointed out * * *, the precaution necessary to comply with the standard of reasonable care varies with the danger involved. Consequently the character of harm likely to result from the failure to exercise care in manufacture affects the question as to what is reasonable care." On the same page Comment b states: "In order that the manufacturer of a chattel shall be subject to liability under the rule stated in this Section, it is not necessary that the chattel shall be one the use of which is intended to affect, preserve or destroy human life. The purpose which the article, if perfect, is intended to accomplish is immaterial. The important thing is the harm which it is likely to do if it is imperfect."

In Colvin v. Powell & Co., 163 Neb. 112, 77 N. W. 2d 900, it is said: "In principle, a manufacturer or other person owning or controlling a thing that is dangerous in its nature or is in a dangerous condition, either to his knowledge or as a result of his want of reasonable care in manufacture or inspection, who deals with or disposes of that thing in a way that he foresees or in the exercise of reasonable care ought to foresee will probably carry that thing into contact with some person, known or unknown, who will probably be ignorant of the danger, owes a legal duty to every such person to use reasonable care to prevent injury to him. * * * In the application of the principle it is immaterial whether or not the conduct of a defendant amounted to a breach

of contract between him and the immediate buyer from him. The duty is not created by contract, but is an instance of the general human duty not to injure another through disregard of his safety." In the opinion there is quoted with approval the following: "In 49 C. J., Poisons, § 4, p. 1045, citing numerous authorities, it is said: 'All persons who deal with deadly poisons or noxious and dangerous substances are held to strict accountability, and the highest degree of care must be used to prevent injury from their use.'"

In Carter v. Yardley & Co., 319 Mass. 92, 64 N. E. 2d 693, 164 A. L. R. 559, it is stated: "At the trial of an action of tort for alleged personal injury sustained when the plaintiff was burned by the application to her skin of a perfume manufactured and bottled by the defendant and sold by him to a retailer from whom the plaintiff purchased it, a finding of want of care in the processes of manufacture and bottling which caused the alleged injury was warranted by evidence that such processes were fully in the defendant's control, that no examination of the contents of the bottle by the retailer was practicable, that when purchased by the plaintiff the perfume was still in the same condition as when bottled * * *." In the body of the opinion the court said: "Plainly the defendant, when it manufactured and bottled its perfume, including the bottle in question, and put it into the channels of trade, expected that those channels would carry each bottle into the hands of some ultimate consumer who would be likely to apply the contents to her skin. If any bottle should contain a harmful ingredient, injury to some unknown consumer rather than to a middleman or retailer must have been anticipated."

A person who had no direct contractual relations with a manufacturer may nevertheless recover from such manufacturer for damages to his property caused by its negligence in the same manner that such a remote vendee or other third person may recover for personal

injuries. The generally accepted doctrine is that there may be a recovery for injury or damage to property if a case in tort law of negligence is made against the manufacturer, that is, if foreseeability and breach of duty are established, if the manufacturer can be found to have been negligent, and that such negligence is the proximate cause of the property damage.

The case of E. I. DuPont de Nemours & Co. v. Baridon, 73 F. 2d 26, involved the liability of the manufacturer of a seed disinfectant or fungicide for damages resulting from its use. The court said: "A rule which would permit a manufacturing chemist, who offered his product to the public for use in the treatment of plants or animals, to so carelessly prepare his product or to so carelessly direct the manner in which it was to be used as to destroy or injure the property of one who purchased it from a dealer and who in ignorance of its dangers used it for its intended purpose and in accordance with the directions of the manufacturer, and which would deny to the person whose property was injured any redress, although the destruction of his property was the natural, probable, and almost certain consequence of the manufacturer's negligence, should not, we think, receive the sanction of this or any other court. * * * The manufacturer is not an insurer that in every instance and under all circumstances no injury will result from the use of his product as directed or recommended, but if he knows or in the exercise of reasonable care should know that if his product is used as directed or recommended it will cause or be likely to cause material injury, then he is liable to any person who, in reliance upon his representations, directions, and recommendations, uses the product for the purpose and in the manner directed and recommended by the manufacturer and who suffers injury as a direct result * * *."

Genesee County Patrons Fire Relief Assn. v. L. Sonneborn Sons, Inc., 263 N. Y. 463, 189 N. E. 551, contains this: "It is earnestly contended by appellant that

even though liability might exist for personal injuries resulting from the explosion there is no legal liability for the property damage resulting. * * * The argument leads to an illogical conclusion. If it were reasonably presumable that the preparation would be used near a flame and result in an explosion and fire which might fairly be expected to injure the person using the material, it would also be reasonably foreseeable that the same fire would cause property damage. * * * To hold that an owner of a building injured by an explosion and fire caused by the use of the material could recover for his personal injury but could not recover for the damage to his clothing or the destruction of his building would be anomalous."

Kolberg v. Sherwin-Williams Co., 93 Cal. App. 609, 269 P. 975, involved damages for injuries sustained by plaintiff from the use upon his orange orchard of a product sold by defendant named "Citro-mulsion" and used for spraying citrus trees to destroy scale. The court said: "The liability of the defendants rests upon the sound rule that a manufacturer or seller of an article inherently dangerous to life or property is liable for injuries to the ultimate consumer who has purchased through a middleman. (17 A. L. R. 674, 683.)"

In Ellis v. Lindmark, 177 Minn. 390, 225 N. W. 395, it is stated: "The evidence sustains a finding of the jury that the defendant drug company was negligent in sending a barrel of raw linseed oil to a retail druggist in response to an order for a barrel of cod liver oil. * * * The evidence sustains a finding that the defendant Lindmark, a retail druggist, who ordered cod liver oil from the drug company and sold to the plaintiffs, who were poultry raisers, the raw linseed oil as cod liver oil, was negligent. * * * The plaintiffs who purchased from the retailer could maintain an action against the drug company though they had no contract relations with it."

The prevailing doctrine as to the liability of a manufacturer to a remote vendee for negligence was ex-

pressed in, if not originated by, the decision of Mac-Pherson v. Buick Motor Co., 217 N. Y. 382, 111 N. E. 1050, L. R. A. 1916F 696, Ann. Cas. 1916C 440, which contains these statements: "We hold, then, that the principle of Thomas v. Winchester (6 N. Y. 397) is not limited to poisons, explosives, and things of like nature, to things which in their normal operation are implements of destruction. If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully. * * * There must also be knowledge that in the usual course of events the danger will be shared by others than the buyer. Such knowledge may often be inferred from the nature of the transaction. * * * We are dealing now with the liability of the manufacturer of the finished product, who puts it on the market to be used without inspection by his customers. If he is negligent, where danger is to be foreseen, a liability will follow. * * * The dealer (who sold the machine to the plaintiff) was indeed the one person of whom it might be said with some approach to certainty that by him the car would not be used. Yet the defendant would have us say that he was the one person whom it was under a legal duty to protect. The law does not lead us to so inconsequent a conclusion. * * * The principle that the danger must be imminent does not change, but the things subject to the principle do change. They are whatever the needs of life in a developing civilization require them to be. * * * The contractor who builds the scaffold invites the owner's workmen to use it. The manufacturer who sells the automobile to the retail dealer invites the dealer's customers to use it. The invitation is addressed

in the one case to determinate persons and in the other to an indeterminate class, but in each case it is equally plain, and in each its consequences must be the same."

In United States Radiator Corp. v. Henderson, 68 F. 2d 87, the court said: "It is impliedly, if not expressly, conceded however by counsel that where the article involved is inherently and imminently dangerous actual knowledge on the part of the manufacturer of the danger need not be proven. Thornhill v. Carpenter-Morton Co., 220 Mass. 593, 108 N. E. 474, 491: 'Proof, however, of actual knowledge is not required where the article is so made up as to be inherently harmful. The manufacturer who puts or causes the component parts to be put together, or accepts them as his own after they are assembled, must be presumed to know the nature and quality of the resultant compound which he solicits the public to purchase.' But we answer the contention with the opinion in MacPherson v. Buick Motor Co., 217 N. Y. 382, 111 N. E. 1050, L. R. A. 1916F, 696, Ann. Cas. 1916C, 440, which has been so widely followed in both state and Federal courts, wherein false labels on poisons * * *, a defective scaffold for workmen, a defective coffee urn, and a defective automobile wheel were included in the same class relative to the question of knowledge."

The contents of the can (exhibit 1) were placed therein and the can was sealed at the plant of chemical corporation in Jacksonville, Florida, in 1954. The label on the can represented the contents as Toxaphene, had a detailed statement of the ingredients thereof, and instructions for its use. The can was sent to a dealer in agricultural chemicals at Grand Island. This dealer handled chemical corporation products. That middleman furnished it to Voigt, an aerial sprayer in Kearney. Air service secured it from Voigt in the original can in 1956 in the condition it was when it and the contents thereof were processed at the plant where the chemical was made. The seal of the can was removed

by Smith August 24, 1957, the chemical in the can was made a part of a spraying solution, and the beets were sprayed with it that day. The events involving the can and its contents constituted a chain from the time it was filled in 1954 until the chemical therein was applied to the beets on August 24, 1957. It was ascertained after the beets showed evidence of injury from the spray that the can contained pure, full-strength 2,4-D. A cause of injury may be the proximate cause thereof though it pass through a series of events if they were combined in a continuous chain through which the force or presence of the cause operated to produce the disaster. Coyle v. Stopak, 165 Neb. 594, 86 N. W. 2d 758.

Air service attempts to escape liability to appellees for the destruction of their sugar beets caused by the application to them by air service of 2,4-D by saying that it secured from chemical corporation a chemical represented by it to be Toxaphene; that it was prepared in a proper manner and in accordance with general practice for spraying the sugar beets for webworms and grasshoppers; that the air service sprayed the beets of appellees with it in a proper manner and by a generally accepted practice; that the container of the chemical so secured by it from chemical corporation was labeled Toxaphene but there was therein, without notice to or knowledge of the air service, 2,4-D which caused the destruction of the beets; that the air service was not negligent but chemical corporation was; and that its negligence was the proximate cause of the damage. The air service was by contract with the partnership employed to spray the beets with Toxaphene. The partner who made the arrangement therefor specified Toxaphene because that was what the partnership had been using and it had been getting good results. Air service had a duty to spray the sugar beets with Toxaphene and no other insecticide or chemical. It could not delegate its obligation to use due care to do this or depend on anyone else to take precautionary measures in

that regard. There is no claim that air service made any investigation, examination, or test to ascertain that the can (exhibit 1) contained Toxaphene and that alone except it examined the outside of the can. Air service could not accept the information there exhibited, spray the beets with 2,4-D, thereby destroy them, and escape liability to appellees for the damage caused. It could not be relieved from its responsibility to protect appellees against the hazard that the can furnished by chemical corporation did not contain Toxaphene but did contain 2,4-D simply because the can was labeled and represented to contain Toxaphene. Hickman v. Parks Constr. Co., *supra,* contains this: "The defendant could not be relieved from its responsibility to protect against the danger from the open excavation by reliance upon Major Morrow to protect against that danger. The person on whom the duty devolves is not excused from taking the necessary precautions by contracting with or relying on others to take necessary precautionary measures." See, also, Colvin v. Powell & Co., *supra.*

Chemical corporation complains that an instruction given the jury told it that one of the issues was whether the chemical corporation was negligent without limiting it to the negligence specified by appellees. The immediately following instruction told the jury that the burden of proof was on plaintiffs (appellees) to prove by a preponderance of the evidence the material allegations of their amended petition (which were recited in a prior instruction) and any negligence of the defendants (appellants) or one of them as charged in the amended petition, and that such negligence was the proximate cause of the damage claimed. Instructions must be considered as a whole and when this is done, if they fairly state the rules of law applicable to the case, that is all that is required. The objection to the instruction is not well taken.

The trial court in substance told the jury that if a manufacturer offers to the public an insecticide it in

effect represents that the insecticide is suited for the purpose for which it is represented and labeled and for which it is sold, and any dealer, purchaser, or user may rely upon such representation. The condemnation of the instruction by chemical corporation is that it submits an issue not in the case. Appellees charged air service contracted to spray the sugar beets of appellees and to perform the contract air service purchased from chemical corporation an insecticide represented to be Toxaphene by labels on the container in which the chemical was contained but that the chemical was not as represented but contained 2,4-D, a chemical injurious to sugar beets with which the beets of appellees were sprayed and destroyed. These allegations were substantially denied by chemical corporation. The objection to the instruction is not justified.

Air service contests the correctness of an instruction in substance that if the jury found from a preponderance of the evidence that air service failed to use ordinary care and negligently allowed the insecticide used by it to spray the beets to be contaminated with 2,4-D sufficient to injure them and that it was the proximate cause of their destruction, then the verdict should be in favor of the appellees and against the air service. The basis of this challenge is that air service asserts that there is no evidence of negligence by it. The record contradicts this conclusion. There is proof of circumstances from which it could be concluded that air service was responsible for contamination of the spraying solution. In any event it is certain that the obligation of the air service was to spray the beets with Toxaphene only and admittedly it sprayed them with 2,4-D and destroyed them. In the circumstances the instruction was not incorrect and it assuredly was not prejudicial. The submission of the case to the jury by the trial court was not prejudicial to either of the appellants.

The judgment should be and it is affirmed.

AFFIRMED.