LESLIE PECK, APPELLEE, v. MASONIC MANOR
APARTMENT HOTEL, APPELLANT.

278 N. W. 2d 589

Filed May 8, 1979.   No. 41895.

John A. Rickerson, for appellant.

S. J. Albracht of Lathrop, Albracht & Swenson, for appellee.

Heard before KRIVOSHA, C. J., McCOWN, and BRODKEY, JJ., and RICHLING and CLARK, District Judges.

RICHLING, District Judge.

This action was commenced in the municipal court of Omaha by Leslie Peck, as plaintiff, against Masonic Manor Apartment Hotel, a corporation, as defendant, to recover for the loss of the plaintiff's boat which had been stored in the defendant's garage.   A jury trial was had in the municipal court and a verdict rendered for the plaintiff in the sum of $5,000.   Judgment was rendered thereon.   Appeal was taken to the District Court for Douglas County. Upon hearing de novo on the record, the case was remanded to the municipal court for retrial, without comment or opinion.   Upon retrial, jury was waived, and pursuant to stipulation the case was

tried upon the transcript, bill of exceptions, including exhibits introduced at the prior trial, and additional evidence. Verdict and judgment were rendered for the plaintiff in the sum of $5,000 and costs. Appeal was again taken to District Court. Upon trial de novo upon the record the District Court affirmed the judgment of the lower court. Timely appeal was filed in this court. We affirm.

The Masonic Manor Apartment Hotel, a corporation, owns and operates an apartment building in Omaha, Nebraska, at 52nd and Leavenworth Streets. In conjunction therewith it also operates a garage which is attached to the apartment building. The garage consists of eight levels, or ramps. The garage contains more stalls than are necessary for the useage of tenants in the apartment building. The excess stalls are rented to other persons or companies.

In December 1975 Leslie Peck, plaintiff-appellee, hereafter referred to as Peck, entered into a written agreement with the Masonic Manor Apartment Hotel, defendant-appellant, hereinafter referred to as Manor. The agreement provided that the Manor agreed to rent space for the storage of Peck's boat upon payment of a stipulated monthly fee, which was paid by Peck in advance from month to month. The Manor reserved the right to move the boat from the stall first designated in said agreement "to another spot in the garage for the convenience of the Masonic Manor." The agreement further provided that the Manor "shall not be held liable for any damage to these boats and equipment while on the premises * * *." The Manor rented space for the storage of 100 boats. In addition, residents of the Manor had space reserved to them for the storage of 117 motor vehicles and the Manor rented space for the parking of an additional 37 vehicles which were owned and operated by others, including two commercial enterprises.

Vehicular entrance and exit was through two large overhead doors just off of Leavenworth Street. Entrance through these doors from the outside could be obtained only by the use of a key or a transistor opening device. Doors could be opened from the inside by depressing a button mounted on a pillar. When functioning properly the doors, once opened, automatically closed in approximately 20 seconds.

No key or opening device was furnished to any boat owner. On the contrary, Peck was advised, when he signed the agreement, of the procedure which was mandatory in order to bring or remove his boat from the garage or go to the boat for the purpose of working thereon.

The manager of the Manor testified "[W]e keep the garage locked at all times" and that the only way the boat could be removed is with the consent and approval of the main office, who in turn would notify the engineers. The manager's office was in the apartment building. In addition there was an engineer on duty at all times. The engineer's duties required his services throughout the apartment building, and at many times a considerable distance from the garage. Before a boat owner could go to his boat, or remove the same, it was necessary that he contact the office by a telephone the Manor provided in a booth outside of the garage doors. An engineer would then be sent to the garage. The engineer would require the boat owner to either show his copy of the written agreement or make satisfactory identification of himself. The engineer then accompanied the boat owner to his boat. The Manor's chief engineer testified that no boat owner could go to his boat without being accompanied by the engineer on duty; that if he came for his boat too early in the morning or too late in the evening he was "out of luck" because the doors were always locked; and that entrance could be gained or the boat removed only by contacting the office which

was open only during the day. Peck testified he went to the garage on a number of occasions, either to work on his boat or to take the boat out for use and to later return it; that on each occasion he had to use the phone provided in the booth at the door to signal; that the engineer on duty came and unlocked the door to let him down to his boat only after he had shown the copy of his agreement and provided satisfactory identification; and that the engineer then accompanied him to his boat. An assistant engineer testified that because of the coming spring and the expectancy that Peck would be removing his boat for use more frequently, the assistant engineer had, on his own volition, moved Peck's boat from ramp eight to ramp six because the exit door was on ramp five and it would be more convenient to both Peck and the Manor to have the boat relocated. Peck testified he was assured the boat would be just as secure on ramp six as on ramp eight and that the same procedure for removing his boat, or getting to it, must be adhered to. On March 26, 1976, Peck went to the garage intending to take his boat out to the lake for use and then to return it. He obtained entrance by first signaling and then exhibiting to the engineer his copy of the agreement and identifying himself. He was permitted to go down to his boat without the engineer accompanying him. When he went to the stall he found his boat missing. He reported this to the engineer, who took him to the manager where the fact that the boat was missing was again reported. A search of the garage by Peck and all the Manor personnel available failed to locate the boat. It was never found or recovered.

The Manor offered no evidence to account for the disappearance of the boat. Its only evidence concerned the procedure whereby boat owners could secure access to their boats and confirmed that owners of motor vehicles either had keys or transistor opening devices for the door. The evidence

confirmed there had been no break-in into the garage. On the day following the discovery of the absence of the boat, Peck returned to the garage to make further search. He found that one of the overhead doors contained a sign indicating that the other door should be used. Upon going to the other overhead door he found it in an open position, thus permitting free access into or exit from the garage. No employee of the Manor was on duty in the area of the opened door. Peck was able to enter and have free access to the garage. He took a picture of the open door as well as of the other door containing the sign. These were received in evidence. The sign was obviously not a hurriedly made one. Upon inquiry Peck was advised by a Manor employee that the sign was kept in the garage for use on those occasions when one of the doors malfunctioned. Apparently that door was malfunctioning and there was some cause for the other one to remain open. Peck's inquiry, for the first time, disclosed that the 117 residents of the Manor as well as the owners or operators of the other 37 motor vehicles, including two commercial enterprises, had full access to the garage by way of key or transistor opening devices furnished by the Manor.

Peck testified as to the amount he paid for the boat when new, shortly before storing it at the Manor garage. He further testified as to further expenses for bringing the boat to Omaha, since the purchase price was f.o.b. elsewhere, as well as to the amounts he had spent in "rigging" the boat. Further foundation was laid by showing his knowledge of boat prices on the market. Peck was permitted, as owner, to offer his opinion of the market value of the boat at the time it disappeared. He testified it then had a market value of $5,000. The Manor offered no evidence to rebut this evidence as to value.

The original petition in the municipal court al-

leged that the loss of the plaintiff's boat was through the negligence of the Manor by permitting unauthorized personnel to gain admission to the premises. Upon remand, and before the second trial in the municipal court, plaintiff was granted leave to amend the petition to conform with the proof by adding an additional allegation of negligence, "in failing to keep a proper lookout for property belonging to the plaintiff."

The Manor assigns as error the finding of the lower court that the plaintiff sustained his burden of proof as to (1) liability and (2) damages.

The Manor's first contention is that the written agreement between the parties relieves the Manor of liability wherein it provided that "The Manor shall not be held liable for any damage to these boats and equipment while on the premises." The Manor contends it was intended that loss of the boat be included in the language "damage to these boats."

In Bishop Cafeteria Co. v. Ford, 177 Neb. 600, 129 N. W. 2d 581, we held: "A written contract which is couched in clear and unambiguous language is not subject to a construction other and different from that which flows from the language used."

The contract was drawn and provided by the Manor. The contention that "loss" was intended to be included in "damage" is without merit.

In addition this court held in Nagaki v. Stockfleth, 141 Neb. 676, 4 N. W. 2d 766: "[T]he right of a bailee to limit his liability as such by contract does not extend to exemption from the consequences of his own negligence, if resulting in damages to bailor.

"[U]nder the rules applicable generally to bailees for mutual benefit or bailees for hire [the bailee is] required to exercise ordinary care for its safekeeping, and is liable to the owner for any loss resulting from his negligent acts or omissions * * *."

Further this court held in Simpkins v. Ritter, 189

Neb. 644, 204 N. W. 2d 383: "It is of the very essence of a contract of bailment that it shall contemplate the return of the property bailed. * * *

" 'The term "bailment" is comprehensively defined as a delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be.' "

The Manor next claims as error the finding that Peck had sustained his burden of proof as to liability. Its argument in support thereof is two-pronged. First, it argues that Peck failed to prove either of the two alleged specific acts of negligence. The uncontradicted evidence of both parties was that Peck delivered the boat to the Manor garage for storage and placed it in the stall assigned by the Manor; that it was moved to a different stall at the discretion of the Manor; that the boat was then under the control of and in the possession of the Manor; and that Peck had no access to the boat except upon the fulfillment of procedures dictated by the Manor. The evidence further established that the boat was to be stored and redelivered to Peck upon Peck's following the prescribed procedures; that Peck had no key or means of entry to the garage without consent of Manor employees; that unknown to Peck until after the boat was missing, 137 tenants and the renters of 37 other stalls, including two commercial companies, had keys or opening devices, or both, available to them and to whomever else they might permit to use them. Peck, upon finding the boat missing, learned of previous garage door malfunctions occurring with sufficient frequency to cause the Manor to have a sign prepared and available when the overhead doors malfunctioned; and that shortly following the discovery of

the loss of the boat Peck found one such door open and no Manor employee present, or other security measure taken, to prevent entry by anyone, including any unauthorized person who might enter the garage from the busy thoroughfare running past the garage or from the business district within which the garage was located. The Manor employees testified they had no idea how the boat turned up missing, thereby confirming that they failed to keep a proper lookout for Peck's boat. The triers of fact, first a jury, next the municipal judge, and finally the District Court upon trial de novo upon the record, have found the evidence sufficient. We concur.

The second prong of the Manor's argument appears to be an attempt to raise the question of whether there was a bailor-bailee relationship or a lessor-lessee one. The case, on the first trial to a jury, was submitted as a bailment. It was retried on the same theory and tried de novo on appeal as a bailment. There appears to be no doubt that the conditions of a bailment rather than that of lessor-lessee existed.

The Manor last assigns as error that the damages were excessive under the evidence adduced at trial.

Peck, as owner, over objection, was permitted to give his opinion as to the value of the boat at the time of loss. Foundation for his testimony as to value was laid by eliciting from him the cost of the boat, cost of transporting the boat to Omaha, cost of motors and other parts and accessories required to "rig" the boat, as well as the purchase price of similar boats on the market in Omaha at the time of loss.

This court in Borden v. General Insurance Co., 157 Neb. 98, 59 N. W. 2d 141, has ruled: "The owner of personal property is qualified to express an opinion of the value thereof solely because of his status as owner of it. * * * The qualification of a witness to give testimony of the value of personal property is

committed to the sound discretion of the trial court and its ruling thereon will only be disturbed when clearly erroneous." This case has been cited and the principles of law set forth therein approved in other decisions of this court.

The Manor offered no evidence to rebut or contradict Peck's evidence of value at the time of loss. For all the reasons set forth above, the findings and judgment of the District Court are affirmed.

AFFIRMED.

KRIVOSHA, C. J., concurs in result.