Jennifer **MEISNER**, Plaintiff,

v.

The **PATTON ELECTRIC CO., INC.**, Defendant.

No. CV89–0–133.

United States District Court, D. Nebraska.

May 25, 1990.

**1434**

Michael Javoronok, Gering, Neb., Robert P. Chaloupka, Van Steenberg, Chaloupka, Mullin & Holyoke, P.C., Scottsbluff, Neb., for plaintiff.

Atkins, Ferguson, Zimmerman & Carney, J.L. Zimmerman and Scott E. Ortiz, Scottsbluff, Neb., for defendant.

## MEMORANDUM AND ORDER

DAVID L. PIESTER, United States Magistrate Judge.

This action came on for trial before the court on March 26th through the 29th, 1990 with the undersigned Magistrate presiding by consent of the parties pursuant to 28 U.S.C. § 636(c). The plaintiff filed this action, based on negligence, strict liability, and misrepresentation, seeking recovery of property damage resulting from a fire at her residence which was allegedly caused by a portable electric heater manufactured by the defendant. At the close of the plaintiff's case at trial the court, on an oral motion by the defendant, directed a verdict in favor of the defendant on the plaintiff's Restatement of Torts 402(b) misrepresentation claim, and the case is now before the court for decision on the remaining negligence and strict liability claims.

The uncontroverted facts as agreed to by the parties are as follows: On February 12, 1986 a fire occurred at the home of the plaintiff in Mitchell, Nebraska. The fire started in an extension cord which provided

power from an outlet located in the plaintiff's bedroom to a Patton Model HF–8 space heater, a television, and a clock radio. The fire was discovered by the plaintiff's daughter, Heather Meisner, at approximately 2:00 P.M. There was extensive damage to the plaintiff's home and personal possessions.

The Patton HF–8 electric space heater was manufactured by the defendant in September, 1985 and was purchased by the plaintiff at Wheeler's Farm Supply store in Scottsbluff, Nebraska in January of 1986. The parties agree that as of the date of the fire, February 12, 1986, there had been no substantial change in the heater from the condition it was in on the date it was sold. The deputy fire marshall in charge of the fire investigation attributed the cause of the fire to the extension cord being used to power the space heater. It is further agreed that, on its highest setting, the space heater draws 12.5 amps of electricity. At the time of the fire two extension cords were in use in plaintiff's bedroom. An 18 gauge extension cord (18 AWG) was plugged into an electrical outlet located on the lower portion of the east bedroom wall. The female end of the 18 gauge cord was a multiple plug-in type into which a television, a clock radio, and a second extension cord were plugged in. That second extension cord was a 16 gauge cord (16 AWG), and the space heater was then plugged into the female end of that cord. Although the evidence at trial indicates some disagreement as to the precise cause of the problem, it was generally agreed among the experts that the fire began from an ignition point in the 18 gauge extension cord.

This products liability action is, in essence, a "failure to warn" case wherein the plaintiff alleges that the defendant is liable for her damages resulting from the February 12, 1986 fire because the defendant failed to provide warnings or failed to provide adequate warnings regarding use of an extension cord with its space heater. The defendant argues that the space heater owner's manual did contain the necessary extension cord warning as required by industry and safety guidelines at that time,

and that the plaintiff was contributorily negligent for failing to read that manual and in her use of a damaged extension cord.

## FINDINGS OF FACT

### *Origin of the Fire*

The testimony of the plaintiff's daughter, Heather Meisner, shows that the fire in the Meisner residence began in the plaintiff's main floor bedroom during the afternoon of February 12, 1986 while Heather and her brother Dana Meisner were at home. Heather had been in the bathroom just outside the plaintiff's bedroom, and while standing at the sink heard what she described as "popping" noises and saw one of the family cats run quickly by the door. As Heather entered the bedroom she saw a "small, three to four inch" fire by the baseboard near the plaintiff's bed. Heather got a glass of water from the sink and threw it on the fire which appeared to only make the fire somewhat larger. At this point she ran downstairs to get her brother Dana, then the two returned to the fire and attempted to put out the fire with a towel, which again was unsuccessful. Heather ran upstairs to her grandmother's apartment, which was attached to the Meisner home, to call the fire department, while Dana ran to the neighbors for a fire extinguisher. They both met back at the location of the fire at approximately the same time and, realizing the fire had spread too far, they exited the house.

The plaintiff testified that she purchased the defendant's space heater from a Wheeler's store during January 1986 during a particularly severe cold spell. The plaintiff stated that after opening the box containing the heater, she found a warranty card and an instruction book inside, both of which she discarded. In her opinion the instruction book was unnecessary to operate the heater given that the switch mechanism on the heater was simple and self-explanatory.

On the day of the fire the heater was sitting on a desk in the plaintiff's bed-

**1436**

room[1], was plugged into the green (16 gauge) extension cord, which was "relatively new," and that cord was plugged into the white cord (18 gauge) which ran under the plaintiff's bed and was plugged into a wall outlet behind the headboard. In addition, the testimony establishes that a Sony color television and a clock radio were also plugged into the female multiple plug-in on the 18 gauge, white cord. The plaintiff turned the heater on at approximately 7:30 or 8:00 A.M. and when leaving the house to take her mother shopping did not turn the heater off. The plaintiff recalls that the heater was probably left on in the "high heat" position. The plaintiff and her mother returned in the afternoon at which time the local fire department was still fighting the blaze at her home.

The testimony of expert witnesses for both the plaintiff and the defendant was nearly unanimous that the fire at the Meisner residence was the result of an overheated extension cord, specifically at the female end of the 18 gauge, white cord where the wires enter the multiple plug-in end, which was caused by a current overload due to the 12.5 amp draw of the defendant's space heater. Deputy state fire marshall, Frank Costa, testified for the plaintiff as to his investigation of the Meisner fire and the conclusions as to its "point of origin." Costa testified that as part of his investigation he was required to determine the point of origin of the fire by establishing the lowest and most severe point of burn, at which point a fire will burn up, over, and then down creating a "V" pattern. In the Meisner house that point of origin was found to be at the multiple plug-in end of the 18 gauge, white extension cord, and above that point was the "V" shaped pattern on the wall.

Costa testified that the overheating of the white extension cord was evidenced by a "sleeving" effect found on a portion of the cord. "Sleeving" is caused when the internal wires of a cord heat up causing the

wires to become very brittle and the outer insulation around the wires actually slips back and forth over the wire. If a cord has been damaged from external heat the insulation will actually melt over the internal wires and stick there, without the internal wires becoming brittle. Costa further testified that there was evidence of shorting out at the burn point of the white cord which is evidenced by a shiny, "beading" effect which takes place at the tip of wires when shorting out occurs. In essence, Costa's conclusion was that the fire in this case occurred when the white, 18 gauge extension cord developed a shorting out at the point on the cord where the wires enter the multiple plug-in. He further opined that the shorting out was due to high resistance from an overloading of the wires, due to the heater drawing more amps than the 18 gauge cord was intended to withstand; thus causing an overheating condition which started the fire.

William J. Hanna, professor of electrical engineering at the University of Colorado in Boulder, testified for the plaintiff regarding principles of electricity and the relationship of those principles to the fire at the Meisner home. Hanna explained the significance of the 16 gauge versus 18 gauge rating of the two extension cords in use at the Meisner home at the time of the fire. First, it was noted that the lower numbers used in these ratings is indicative of heavier wire used to carry the electrical current. The heavier the wire used, the lower the resistance which allows for increased electrical current flow. Thus the thinner wire of the 18 gauge extension cord has a higher resistance, and that resistance causes heat to be produced. 18 gauge cords have the capacity to safely carry approximately ten amps of electricity, while 16 gauge cords have the capacity to carry 13 amps.

The expert witnesses called at trial generally agreed that the space heater, when

---

**1.** There was some contradictory testimony from deputy fire marshall Costa which indicated that the heater may have been sitting on the floor of the plaintiff's bedroom at the time of the fire. However, Costa did not indicate that the location of the heater played any role in the cause of the fire since, in his opinion, it was the overheating of the extension cord which started the flames.

running on its highest setting of 1500 watts, draws a current of 12.5 amps.[2] It was also established that the Sony television would draw, at most, 1 amp of power through the cord and the clock radio would draw one-half amp or less. There was no indication from the evidence that the television was on at the time of the fire. Indeed, the expert testimony generally indicated that having the television and the clock radio plugged into the 18 gauge cord in conjunction with the heater was of little or no significance in their determination of the cause of the fire.

It was established by Hanna that the space heater at the Meisner home had been in the "On" position at the time of the fire. In addition, the plaintiff called Dr. Charles Culver, a consulting engineer who has investigated numerous fires to determine the point of origin, who testified that through x-rays of the remains of plaintiff's heater and comparison to an undamaged Patton heater identical to that bought by the plaintiff, he was able to conclusively determine that the Meisner heater was set in the highest heating position, 1500 watts, at the time of the fire. Culver's testimony also corroborated that of fire marshall Costa as to the cause of the fire, that being that with the space heater in the high heat position it would be drawing 12.5 amps through the 18 gauge (white) extension cord, which could safely carry only 10 amps, causing a hot spot at the point where the wires entered the female receptacle (plug-in).

Defendant's only expert to testify regarding the cause of the fire, Barry Feinberg, a consulting engineer with an extensive background in electrical engineering, but not an expert in fire investigations, agreed with other experts as to the location of the "hot spot" or point of origin, but added that such a hot spot was probably caused by a process known as "necking" where the tiny strands of copper wire inside the extension cord are broken or damaged by the constant flexing or back and forth movement of the cord, especially at the ends of the cord. There was no testimony from Feinberg or any other witnesses that such damage caused from the "necking" process would be readily apparent or visible to the average person, or that the average person would know of such damage.

It is clear from the evidence that Patton heater in and of itself was not the cause of the Meisner fire; there was no malfunction of the heater or defective mechanical or electrical condition which caused it to overheat or burn. The evidence establishes that the heat needed to start the fire was created by the extension cord in use with the heater, and that heat was produced as a result of the 12.5 amps being pulled through the 18 gauge cord which was designed to carry a maximum load of 10 amps.

### Failure to Warn

This brings us then to the crux of the plaintiff's action. The plaintiff admits that the Patton heater was not defective in its operation or workmanship, but claims the product was defective due to the absence of an adequate warning about the dangers of using the product with an extension cord. The defendant raises contributory negligence, misuse, and "state of the art" as defenses to the plaintiff's claim. Specifically, the defendant first asserts that the warning provided with the Patton heater in fact exceeded the industry standards at the time it was manufactured, and further asserts that the cause of the Meisner fire was the plaintiff's contributory negligence and misuse when she failed to heed the includ-

---

**2.** Defendant's expert witness, Barry Feinberg, a consulting engineer with an extensive background in electrical engineering, testified that the space heater would only pull 12.5 amps if it were plugged directly into a wall outlet, but not if it were plugged into an extension cord. Feinberg's opinion was that if one plugged such a heater into an 18 gauge cord with a higher resistance (higher than a 16 gauge), the heater would actually draw less amperage because that higher resistance would impede the flow of electricity. Such a theory was not alluded to or corroborated by any other expert witness, and there was no evidence that the functioning of heater was impaired, which one would expect if it were unable to draw sufficient amps to operate as it should at the highest setting.

ed instruction book which contained a warning about the use of the product with an extension cord. The plaintiff responds that in order for a warning to be adequate on this heater, it must be directly attached to the unit itself rather than merely printed in an instruction booklet which can easily be discarded and ignored, and which would be easily missed by a reasonable person.

The Patton HF–8 space heater in evidence at trial, identical to that purchased by the plaintiff, contains four separate pieces of paper, at least two of which the plaintiff remembers being in the box when she opened it at home. There is a blue and white warranty card, a postage paid envelope in which such card can be returned to Patton, a single sheet of paper with printing on both sides relating to replacement clean air filters, and finally, the "instruction book" at issue in this case. The plaintiff's testimony did not indicate whether these papers were at the bottom of the box or on top of the heater when she opened it.

The "instruction book" is a white sheet of 8½ × 11 paper with black lettering which is folded in half in the center to produce a booklet. The front contains the name "PATTON" in large block type with the phrase "When your comfort demands the best" below the name. On the lower right corner of the front the model number is identified and the Underwriters Laboratories insignia is directly below. On the back of the booklet, the last page, there is a drawing or schematic of the workings of the heater with identifying numbers for replacement parts. On the inside, second page of the booklet the page begins with the words "OPERATING INSTRUCTIONS—MODEL HF–8 HEATER PLUS FAN." The entire inside of the booklet consists of nine short paragraphs and a diagram of the switch settings.

For purposes of this case, the defendant asserts that this booklet, at paragraph number 3, contains an adequate warning regarding the use of extension cords with the heater. That paragraph states as follows:

"*TO OPERATE:* Plug heater directly into standard 110–120V wall outlet. DO NOT use extension cord."

This paragraph is in ordinary black lettering a little above the center of the second page of the booklet. Directly above that paragraph is the following paragraph:

*CAUTION:* Although this heater is designed to provide maximum comfort and safety, improper use, as with any electrical appliance, could lead to shock, burns, or fire hazard. Disconnect heater when leaving unattended for long periods or when moving or cleaning it. Place heater away from loose hanging drapes, towels, or other readily combustible materials. DO NOT insert foreign objects into heater vents or openings. Use on flat, dry surfaces only. DO NOT leave small children unsupervised near heater.

Again this paragraph is in black lettering.

## STRICT LIABILITY

■ Nebraska law requires that a plaintiff in a strict liability action prove, by the greater weight of the evidence: (1) that the defendant placed the product on the market; (2) that at the time the product left the defendant's possession, it was defective in one or more of the ways claimed by the plaintiff; (3) That this defect made the product unreasonably dangerous for its intended use, or for any use the defendant could have reasonably foreseen; (4) That this defect was a proximate cause of some damage to the plaintiff; and (5) The nature and extent of that damage. *Erickson v. Monarch Industries, Inc.,* 216 Neb. 875, 347 N.W.2d 99 (1984); *Kohler v. Ford Motor Co.,* 187 Neb. 428, 191 N.W.2d 601 (1971).

■ In this case it is undisputed by the defendant that it placed the Patton HF–8 space heater, identical to that purchased by the plaintiff, on the market. The first issue then is whether at the time the heater left the defendant's possession it contained a warning against the use of extension cords. The plaintiff argues that Patton heater contained no warning relating to use with an extension cord, and further argues that this heater should have had a "hang-

tag" securely attached to the power cord or at a minimum a highly visible warning on the heater itself. The defendant argues that the booklet referred to above was in fact a warning, and that had the plaintiff read the booklet she could have avoided the harm. Based on the evidence I find that in fact the instruction booklet at issue was not a "warning" to the reasonably foreseeable user.

William Hanna stated that in his opinion a warning must state the risk; in other words it must apprise the user of the consequences of using an extension cord with the heater, and it must be adequately displayed. Defendant's witness, Dr. Richard Gill, an expert in "human factors" who has done research on the effectiveness of warning labels, stated that although he believes, based on his research, that people tend to ignore warning labels, he still would consider the following to be desirable items to be included on warning labels:

(1) Signal words to make the warning apparent;

(2) Description of the nature of the hazard;

(3) Description of the consequences of ignoring the hazard; and

(4) Instructions for avoiding the hazard. Gill did not agree, however, that this was the minimum requirement for a warning label.

On the basis of the Patton heater instruction booklet, the experts' opinions regarding proper warnings, and the generally accepted meaning of the term "warning," I find as fact that there was no warning of the danger of using the Patton heater with extension cords when the product left the defendant's possession. Nothing on the front of the instruction booklet gave any notice to the plaintiff as to what was in that booklet, and certainly gave no indication as to the importance of the contents, such as instructions "Please Read" or "Read Before Operating." Even if the plaintiff had opened the booklet and looked at the second page where the extension cord reference is used, that language is stated under the category "To Operate," not under the "Caution" heading, a signal word that might alert a user to any potential hazards of the heater. The reference to extension cords is in the same color and size print as all of the other words in the booklet, and it is in the center of the second page of the booklet making it even easier to miss. In short, there is nothing about that language which would have indicated to the plaintiff that she should read that paragraph in particular, or to distinguish it from the other parts of the booklet.

In addition, even if the plaintiff had read the extension cord reference, nothing in that paragraph would describe for her the reason for avoiding the use of an extension cord. There is no mention of the potential consequences of ignoring the advice given in the booklet. The plaintiff had no way of knowing from the language if use of an extension cord would cause fires or merely affect the operation or efficiency of the heater; simply put, there is no indication from that language that the use of an extension creates a danger or a hazard at all. From all these factors I find that the "instruction" booklet was not a warning to the plaintiff and did not contain a warning to the plaintiff.

■ The next question to be answered is whether this lack of an affixed warning on the heater made the heater an "unreasonably dangerous" product for its intended use or for any use the defendant could have reasonably foreseen. There was no disagreement among any witnesses that the defendant Patton Electric could have reasonably foreseen that their HF–8 heater would be used in households like the plaintiff's with extension cords. In addition, the weight of the evidence showed that if this heater was operating at its highest power, 1500 watts, use with an 18 gauge extension cord would make it unsafe.

■ Nebraska law states:

A product is unreasonably dangerous if it creates a risk of harm beyond that which would be contemplated by the ordinary foreseeable user.

*Hancock v. Paccar, Inc.*, 204 Neb. 468, 484, 283 N.W.2d 25 (1979); NJI 11.24.

In this case I conclude that the absence of any warning regarding the use of the Patton heater with extension cords does "create a risk of harm beyond that which would be contemplated by the ordinary foreseeable user." The defendant presented no evidence to dispute that the plaintiff, Jennifer Meisner, was an "ordinary foreseeable user," and I find as fact that she indeed is such. As an ordinary foreseeable user, her testimony establishes that she has no knowledge of the principles of household electricity and the meaning of such terms as "amps," "watts," or gauges of extensions cords or the interrelationship among those factors. Indeed, expert testimony at trial showed that the average consumer probably does not have such knowledge. Therefore, I find that the overheating of an extension cord due to the 1500 watt draw of the heater when in the high setting was a risk of harm beyond the contemplation of the plaintiff as an ordinary foreseeable user. In the absence of a warning against such use, the defendant had created such unreasonable risk of harm. I therefore conclude that the lack of a warning with the Patton HF–8 heater made that product unreasonably dangerous.

■ The plaintiff must also prove that the defendant's failure to warn was the proximate cause of some damage to her. "A proximate cause is a cause that produces a result in a natural and continuous sequence, and without which the result would not have occurred." *Union Pacific R. Co. v. Kaiser Agricultural Chemical Co.*, 229 Neb. 160, 173, 425 N.W.2d 872 (1988); NJI 3.41. The question in this case is whether the failure of the defendant to provide a warning against the use of extension cords was a proximate cause of the fire at the plaintiff's home.

According to the plaintiff, if the defendant had included a warning on the cord or on the heater itself that warned against the use of extension cords she would have read and heeded such a warning. The plaintiff stated that she has seen warning tags on the cords of hairdryers and a large warning on an incubator she has for duck eggs,

pays attention to those tags and obeys those warnings. While it is obvious that such an assertion is a self-serving statement on plaintiff's part, I find that her testimony was forthright and credible and it is more likely than not that she would have heeded such a caution.

The defendant presented testimony from Dr. Richard Gill showing that many consumers fail to heed even obvious warnings on products such as the electric heaters at issue herein. However, even if the court were to accept Gill's findings as true, this would not necessarily relieve the defendant of its duty to warn, and would not necessarily be indicative of this plaintiff's reaction to a warning tag on such a heater. In addition, Gill's testimony also indicated that several studies have reached contrary conclusions to those of Gill's.

The expert testimony at trial was unanimous on the conclusion that the Patton HF–8 heater was an unsafe product when operating on its highest setting and connected to an 18 gauge extension cord with the ability to draw only 10 amps. Such testimony also supports the conclusion that it was the 18 gauge white extension cord in the Meisner home which caused the fire that destroyed the house and its belongings. The lack of warning to the plaintiff was not, undoubtedly, the "immediate" cause of the fire in this case, but certainly the lack of such warning "set in motion a series of events through which it produced the damage." *Rose v. Buffalo Air Service*, 170 Neb. 806, 833, 104 N.W.2d 431 (1960). I therefore find from the evidence that the defendant's failure to warn the plaintiff regarding the use of extension cords and the consequences of such action was the proximate cause of the plaintiff's damages.

## DEFENSES

■ The defendant raises three defenses to the plaintiff's claims. It is first alleged that the plaintiff misused the product by failing to heed the warning in the "instruction" booklet which was included with the Patton HF–8 heater. Misuse of a product is a defense in Nebraska in strict

liability cases. *Erickson v. Monarch Industries, Inc., supra; Hancock v. Paccar, supra; Hawkins Construc. Co. v. Matthews Co., Inc.,* 190 Neb. 546, 209 N.W.2d 643 (1973). One such misuse is the "failure to follow plain and unambiguous instructions regarding use of the product." *Erickson, supra,* 216 Neb. at 887, 347 N.W.2d 99. In order to prove its defense of misuse the defendant must show: (1) That the plaintiff failed to read the "instructions" from the defendant; (2) That the defendant could not reasonably have foreseen such a use of the product; and (3) That this misuse by the plaintiff was a proximate cause of her own damage. *Hawkins Constr. Co. v. Matthews Co., Inc., supra; Hancock v. Paccar, supra.*

■ The question raised is whether the plaintiff "failed to follow plain and unambiguous instructions" from the defendant and whether the defendant could not have reasonably foreseen such a failure to heed those instructions. Undoubtedly the plaintiff admitted at trial that she did not read the booklet which included the sentence, "DO NOT use extension cord," but merely discarded it with the warranty card she found in the box.

The defendants rely upon *Erickson v. Monarch Industries, Inc., supra* to support their theory that the plaintiff's failure to read the enclosed booklet was misuse which constitutes a bar to recovery under strict liability. I cannot agree.

*Erickson* was a wrongful death action wherein the decedent was killed following an explosion of an electrical transformer which supplied power to a grain drying facility. Two of the defendants were the manufacturer and the supplier of the transformer. One of the plaintiff's claims alleged that these defendants were strictly liable for their failure to warn the user of the danger presented by the product. The court found that the defendants had enclosed sufficient "directions for wiring with the transformer and referred the user to the National Electrical Code for proper fusing," *Id.* at 886, 347 N.W.2d 99, and that the supplier knew that person to whom the transformer would be sold "would have

special knowledge as to how to install the transformer." *Id.* at 887, 347 N.W.2d 99. Based on those facts, the court held that the defendants had "no additional duty to warn" of the dangers associated with the product. The court stated, "[i]t is not reasonably foreseeable that a consumer of particular expertise would fail to follow directions." *Id.*

In particular, the defendant relies upon the following language from *Erickson:* "Failure to follow plain and unambiguous instructions is a misuse of a product." That language was taken from a Texas case, *Procter & Gamble Manufacturing Co. v. Langley, on rehearing,* 422 S.W.2d 773, 778 (Tex.Civ.App.1967). In that case a woman sued the manufacturer of a home hair permanent kit which caused her hair to fall out above the roots. The plaintiff had used four home permanents prior to purchasing this product (the opinion does not specify whether she had previously used the defendant's product) without ill effects. In *Langley* it was clear that the plaintiff had seen and read the enclosed instructions and warnings and testified that she understood the directions and warnings. Despite the directions and warnings the plaintiff did not follow directions and she was damaged by the product.

In reversing the jury's decision for the plaintiff the court held that the plaintiff's failure to follow instruction which she stated that she understood barred her recovery under an implied warranty theory. The court held:

> [A] consumer may [not] knowingly violate the plain, unambiguous instructions and ignore the warnings, then hold the makers, distributors, and sellers of a product liable in the face of obvious misuse of the product.

*Langley, supra* at 780.

I do not agree that these cases are controlling in the face of the facts presented by this plaintiff's case. Unlike *Erickson,* this plaintiff had no special knowledge of electricity or electrical products upon which a manufacturer could rely. In addition, the court in *Erickson* was addressing the question of whether the manufacturer had an

additional duty to warn once it had included instructions for wiring in a product that was intended for sale to persons with a special expertise. *Erickson* did not answer the question of whether mere instructions on use can take the place of warnings regarding unforeseeable dangers of a product when that product will be sold to average consumers with no expertise in the handling of the product. It held only that under the facts before the court those defendants had no additional duty to warn of the product's dangerous propensities. The comments to NJI 11.23, which state the law on insufficient warnings, quotes from a Colorado case, *Downing v. Overhead Door Corp.*, 707 P.2d 1027 (Colo.App.1985); that quote is particularly applicable here:

> [P]roviding instructions for the installation of the product which lack detail and specificity is no substitute for adequate warnings of the dangers possible where misuse may have disastrous results.

*Id.* at 1032–33.

I also see the *Langley* case as distinguishable from this plaintiff's action. In that case the product contained detailed instructions and warnings which were obvious to the user, and indeed were necessary for the use of the product. Here the plaintiff bought a space heater which took no particular skill to operate [3] after one looked at the heater itself. In addition, as noted above, the face of the "instruction" book, as the defendant has termed it, gives absolutely no indication that it is such a book, and gives no indication as to the necessity of reading the book. In short, there is nothing on the outside of this booklet which would prompt a user to read or further investigate its contents.

This case is not one where a consumer read instructions or warnings and then chose to ignore them. This is a case where the defendant failed to alert a consumer to the dangers associated with the use of its product, and now seeks to avoid liability by asserting that such a "warning" was with the product if only the consumer had looked hard enough. A manufacturer can-not bury a warning somewhere in paper materials included with the product and later assert such a warning as a defense, especially when the very inclusion of that caution is clear evidence that the manufacturer knew that such a use was a foreseeable danger. In both of the cases cited above the courts held that the manufacturer had adequately and in some detail either instructed or warned of the need for certain cautions in the use of its product. That is not the case here, and I find that the plaintiff did not misuse the product by her failure to read the enclosed booklet.

■ The defendant also raises contributory negligence as a defense to the plaintiff's strict liability action, apparently alleging both for her failure to see the enclosed "warning" in the booklet and for allegedly using a faulty extension cord which, as the defendant asserts, was the cause of the fire.

I first note that there seems to be some confusion in Nebraska law at this time as to whether contributory negligence is a valid defense to a strict liability claim. The traditional rule stated that such a defense was not available in these actions. *See, Hawkins Construc. Co. v. Matthews Co., Inc.,* 190 Neb. at 567, 209 N.W.2d 643 (1973). However, in 1985 the Nebraska legislature passed a law which became Neb.Rev.Stat. § 25–21,185 which states, in relevant part, as follows:

> In all actions brought to recover damages for injuries to a person or to his property caused by the ... act or omission giving rise to strict liability in tort of another, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery when the contributory negligence of the plaintiff was slight and the ... act or omission giving rise to strict liability in tort of the defendant is gross in comparison, but the contributory negligence of the plaintiff shall be considered by the jury in the mitigation of damages in proportion to the amount of contributory negligence attributable to the plaintiff....

---

**3.** This is not to say that it would take no particular skill to know of certain dangers associated with the use of that product with an extension cord.

Since the passage of that statute the Nebraska Supreme Court, in *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 451–52, 412 N.W.2d 56 (1987) has, at least in dicta, restated the traditional rule, citing *Hawkins, supra*, even in the face of the language of the statute which was quoted by the court in its opinion. In addition, the legislative history of the statute indicates that it was intended to state the law in Nebraska as it existed prior to passage. I conclude that the Nebraska Supreme Court if faced with this exact issue, would hold, as it indicated in *Rahmig*, that contributory negligence is no defense.

■ Even if I were to assume that the defendant may raise contributory negligence as a bar to the plaintiff's strict liability claim, I find that the plaintiff was not contributorily negligent under either of the defendant's theories. As stated above, the facts of this case support a conclusion, and I so find, that the plaintiff did not misuse the heater by failing to read the enclosed booklet, nor would her failure to appreciate the alleged importance of the booklet or to read it be considered negligence on her part.

The defendant also argues that the plaintiff was contributorily negligent by her use of a defective or faulty extension cord which was in fact the primary cause of the fire. I find no evidence from the trial to support such a conclusion. Other than defendant's expert, Barry Feinberg, no other witness intimated that the 18 gauge cord in use by the plaintiff was damaged or faulty, and none testified that a damaged cord was the cause of the fire in this case. Feinberg speculated that the process of "necking" may have caused certain of the interior copper wires to have been severed, thus resulting in a spark or arching which may have caused the fire, but he did not state that the insulation on the cord was broken or cut to a point that such spark could have escaped to ignite the surroundings. The evidence indicated that the "necking" process referred by Feinberg was no more than the normal wear and tear that any household extension cord goes through, but did not indicate that the cord was damaged

so badly that it was the principal or even a contributing factor in the fire.

■ Finally, the defendant raises the "state of the art" defense by alleging that the Patton HF–8 heater and the "warnings" it contained were the state of the art at the time of the product's manufacture. In support of its defense defendant called Robert Knourek, a retired electrical engineer with Underwriters Laboratories, as an expert to testify that at the time this heater was manufactured and sold it met the appropriate ANSI (American National Standards Institute)/UL standards concerning product warning labels, specifically ANSI standard UL 1025. These national standards are national minimum standards, and compliance with the standards by industry is voluntary.

The Nebraska statute providing for this defense, Neb.Rev.Stat. § 25–21,182 defines "state of the art" as "the best technology reasonably available at the time." The statute allows this defense upon proof that "such design, testing, or labeling was in conformity with the generally recognized and prevailing state of the art in the industry at the time the specific product ... was first sold...."

The testimony clearly shows that at the time of the manufacture and sale of the patton HF–8 heater the UL 1025 standard applicable to these heaters did not require a warning tag either on the heater itself or on the cord in the form of a "hang-tag." The question then is whether these ANSI/UL standards alone are sufficient to prove that a product conformed with the "state of the art" at the time of manufacture. From the evidence at trial and the definition of "state of the art" in Nebraska I find that compliance with UL standard 1025 alone was not sufficient evidence to prove that the Patton heater was in conformity with the "generally recognized and prevailing state of the art in the industry."

As noted above, ANSI standards are voluntary standards, and more importantly, *minimum* standards. Proof of compliance with these standards, or as in this case proof that the product may have exceeded that standard by the inclusion of the state-

ment "DO NOT use extension cord," is not necessarily proof of "the best technology reasonably available at the time" or proof as to what warnings the rest of the space heater industry was using at the time, if any at all. The Nebraska Supreme Court has stated:

> While the jury may consider, as evidence of the state of the art, the fact that no manufacturer is doing that which is claimed could be done, such evidence will not establish conclusively that state of the art. Obviously, the inaction of all the manufacturers in an area should not be the standard by which the state of the art should be determined.

*Hancock v. Paccar*, 204 Neb. 468, 480–81, 283 N.W.2d 25 (1979).

The testimony in this case established that the technology was available at the time Patton manufactured the HF–8 heater to place warnings on the power cord or on the heater unit itself. Indeed the defendant did not argue or present evidence to contradict the assertion that they could have placed such warnings in a permanent fashion on the heater. The argument of the defendant is simply that UL standards did not require such a warning. On that basis alone I find that the defendant has failed to meet its burden of showing that lack of warning, or even the "instruction" booklet statement alleged to be a warning, conformed with the generally recognized and prevailing state of the art, i.e., the "best technology reasonably available." [4]

Based on the above stated findings I find that the defendant placed the Patton HF–8 space heater on the market, that at the time the heater left the defendant's possession it was defective in that it did not contain a visible warning regarding the dangers of use with extension cords, and that defect made the heater unreasonably dangerous. Further I find that this defect was a proximate cause of the fire which caused damage to the plaintiff's property. [5]

## DAMAGES

The plaintiff seeks recovery of damages for loss of personal property in the amount of $110,808.67, damages to improvements to real property for the loss of her house in

---

4. Nor do I accept the defendant's argument that "hang-tags" on heater power cords would not be feasible because it would detract from the aesthetic value of the unit, and therefore impair sales. The majority of consumers, and in this case the plaintiff, would choose the heater based on the box it comes in at the retail store and would never see a "hang-tag" on the cord until they got the product home. This is not a credible argument for lack of feasibility.

5. The plaintiff also asserted a claim of negligent failure to warn against the defendant. Given my disposition of the plaintiff's strict liability claim it is unnecessary to discuss the negligence claim at any length. Nonetheless I find, based on the facts as stated in the accompanying memorandum, that if this suit were to be decided on the basis of the negligence claim, I would reach the same liability conclusion. As stated above, there is no dispute that the defendant manufactured the Patton HF–8 heater and the plaintiff was a reasonably foreseeable residential user of that product. The evidence in this case supports a finding that the defendant had reason to know that its product was likely to be dangerous when used with an extension cord. That conclusion is particularly supported by the deposition testimony of Harold Pawlowski, former director of engineering for the defendant who was involved in the development of the Patton HF–8 heater. Pawlowski testified that the defendant company was aware of the overheating hazards associated with the use of extension cords with products of this type, and stated that this was the reason why the company put the "DO NOT use extension cord" language in the booklet enclosed with the heater. It is also clear from the evidence that the defendant knew or had reason to know that the average user of this product would not realize the danger of such use of extension cords. Finally, from the evidence cited in my discussion of plaintiff's strict liability claim, I find that the defendant failed to provide reasonably foreseeable users of its product with adequate warning of the dangers associated with the use of its product with extension cords, and that lack of warning was a proximate cause of damage to the plaintiff. *See, Erickson v. Monarch Industries, Inc., supra; Libby–Owens Ford Glass Co. v. L & M Paper Co.*, 189 Neb. 792, 205 N.W.2d 523 (1973); *Driekosen v. Black, Sivalls, & Bryson, Inc.*, 158 Neb. 531, 64 N.W.2d 88 (1954). A reasonable manufacturer in the position of the defendant would have warned foreseeable users of the above stated hazard and would have included a clearly visible device, a "hang-tag" on the power cord or other sticker on the heater itself, to alert the user to that hazard. The defendant in this case did not use "reasonable care in protecting consumers from an unreasonable risk of harm" and would, therefore, be negligent. *Erickson, supra*, 216 Neb. at 875, 347 N.W.2d 99.

the amount of $162,249.25, and damages for the value of the loss of use of her property in the amount of $6,074.46, for a total damage award of $279,132.38.

### Damage to Personal Property

The plaintiff testified that her personal property in her home was both unique and plentiful. The amount of personal property was due in part to the fact that her home had nearly 4,000 square feet of living space. In addition, the plaintiff was previously married to Randy Meisner, bass guitar player for the rock group, the Eagles, and much of the personal property was purchased during a period of time in their marriage when Mr. Meisner was making a substantial income from his success with that band. The plaintiff previously owned her own clothing store, "The Clothes Horse," and built a business called "Jenny Unlimited," which eventually went from retail to wholesale. Many of her personal possessions were antiques in the form of furniture, a "Madame Alexander" doll collection, and original prints. She had numerous studio photographs of her children, standard household furnishing and housewares besides the antiques, items such as framed calenders, and designer clothing. Several of the items in plaintiff's home were irreplaceable, such as the ashes of her father in an urn, a large wood cabinet which was purchased from the late singer Rick Nelson, and antiques that had been in the plaintiff's family for quite some time. Three photographs of the interior of the home which were admitted into evidence show that the Meisner home was quite full of framed art, framed prints and posters; numerous items of bric-a-brac such as wall plates, small statuettes and figurines, pottery, etc.; there appeared to be several hand sewn throw pillows, unusual clocks, a variety of lamps, a piano, and newer living room furniture. Assuming that these pictures are indicative of all of the rooms in the Meisner home, it is fair to say that the plaintiff had a substantial amount of personal property. In addition to these losses the plaintiff's family cats were killed in the fire.

Nebraska law on recovery of damages for loss of personal property which cannot be repaired or replaced, as the evidence in this case indicates as to plaintiff's property, is as follows:

> Where the damage to personal property is such that it cannot be repaired and the property thereby restored to substantially its condition before the damage occurred, or when the reasonable cost of repair exceeds the difference in market value of the property immediately before and immediately after the injury, the measure of damages is the lost market value plus the reasonable value of the loss of use of the property for the reasonable amount of time required to obtain a replacement....

*Chlopek v. Schmall*, 224 Neb. 78, 89, 396 N.W.2d 103 (1986).

In *Jeffres v. Countryside Homes*, 220 Neb. 26, 30, 367 N.W.2d 728 (1985) the Nebraska Supreme Court stated:

> While the rule may be different in the case of realty, at least with respect to personal property ..., the law is well settled that the owner of personalty is qualified to express an opinion of its value solely because of her status as owner. *Peck v. Masonic Manor Apartment Hotel*, 203 Neb. 308, 278 N.W.2d 589 (1979). Cf. *Langfeld v. Department of Roads*, 213 Neb. 15, 328 N.W.2d 452 (1982).

*See also, Kristensen v. Reese*, 220 Neb. 668, 371 N.W.2d 319 (1985). Here the plaintiff's testimony as to the value of her personal property is the sole evidence offered in support of her claim. While the defendant does not challenge her qualifications to offer such an opinion, it does challenge the credibility of her estimates. The defendant closely scrutinized the plaintiff's values by pointing out that the typed list of property included figures which appeared suspicious, such as the figure $31.05 appearing thirty-five times as well as frequent use of the figures $310.05 and $1035.00. Similar questions were raised as to the figure $41.40 and $414.00, and the figures $155.25 and $1,552.50. These arguably peculiar results were, however, ade-

quately explained by the plaintiff when her original list of property values was received into evidence. On that original list, executed two or three days after the fire, the plaintiff has rounded values to even number estimates such as $30.00, $40.00, $1500.00 etc. To these figures taxes were added to the typed list which made the values on that list appear somewhat contrived and suspect. The plaintiff's original list is a compilation of round number value estimates which one would expect from the average person attempting to put a price on household goods in a rather short period of time. Therefore I find nothing unduly suspect about the plaintiffs original list or her explanation of the typed list and conclude that it was a credible, honest effort at valuation of her possessions.

The valuation assigned by the plaintiff to her personal property are measured in terms of replacement costs. The plaintiff's evidence of her damages is, at best, the bare minimum of proof required for the measure of damages. As noted above the necessary proof in cases such as this is the market value of the personal property just prior to destruction. There was no contradictory evidence or objection from the defendant as to the measure of the plaintiff's personal property damages.

■■■ Despite the plaintiff's failure to offer precise evidence of the market value of her personal property, the plaintiff's values may be used to infer a fair market value for at least a portion of her property. Damages must be shown by the plaintiff "with as much certainty as the case permits," *Meisinger Earth Moving, Inc. v. State*, 212 Neb. 554, 560–61, 324 N.W.2d 387 (1982), and they need not be proved with "mathematical certainty." *Miller v. Stan Ortmeier Constr. Co.*, 229 Neb. 259, 266, 426 N.W.2d 272 (1988). The evidence must be sufficient to enable a trier of fact to estimate with a reasonable degree of certainty and exactness the actual damages. *Id.* As held by the Eighth Circuit in another case involving Nebraska law on damages, "[s]o long as a sufficient basis is asserted from which damages can be approximated, a reasonable method of compu-

tation is permissible." *Michael Todd & Co. Inc. v. Lacal Co., Inc.*, 583 F.2d 1056, 1058 (8th Cir.1978). However, damages may not be based on mere speculation and conjecture. *Miller v. Stan Ortmeier Constr. Co.*, 229 Neb. 259, 266, 426 N.W.2d 272 (1988).

When the plaintiff was attempting to estimate the value of her personal property in this case, she was working with a major handicap: property that was completely destroyed, some to the point of non-recognition. Absent her memory, there is no way of knowing what items in her home she may not have included in her damage list. Indeed, from examining the photographs of the inside of the plaintiff's home after the fire, it is likely that the plaintiff may not have remembered all of her personal possessions. Be that as it may, the damage estimate in this case will be based on the plaintiff's original list of property lost.

For purposes of measuring the plaintiff's damage to personalty, I shall divide her list into three categories: the antique items, the studio portraits of her family, and all other items listed.

■■■ I distinguish between the plaintiff's antique possessions and others based on the fact that antiques would have a tendency to appreciate in value or hold their value, rather than to depreciate, if properly cared for, and it is clear from the pre-fire photographs that plaintiff's property was well kept. The plaintiff testified that she estimated her damages as to her antiques based on what she paid for the items, and after consultation with a local antique dealer who was familiar with the specific items which the plaintiff owned. Given the fact that these items do not tend to depreciate, it is reasonable to assume that the plaintiff's estimates are an accurate reflection of the market value of that property. As noted above, the defendant did not challenge the estimates of the plaintiff on the basis of an incorrect measure of damages. Thus, as to those items of antiques listed by plaintiff on her original list I shall accept her valuations as the market value of that property.

The studio portraits are of a category of property for which there is no market in which to determine its value. For that reason the general rule of law for these items allows a plaintiff to use "actual value," or more appropriately replacement value. *See,* C.J.S. *Damages* § 83, at p. 907; Dobbs, *Handbook on the Law of Remedies,* § 5.12, at p. 392 (1973). Plaintiff testified without objection that her values on the portraits were taken from the photography studio's records where the portraits were taken. Although these amounts appear excessive, they were not challenged by the defense, and I accept them as a fair estimate of replacement value, in accordance with the general authority cited above.

Plaintiff's valuations of her other property losses were based on her recollections of actual cost, or replacement cost as determined by pricing similar goods in local stores after the fire. This is not reflective of the actual market value of the items before the fire. There is no practical method of calculation which would allow this court to determine a fair estimate of pre-fire market value without engaging in speculation and conjecture, which I cannot do. *Miller, supra.* I therefore cannot accept the plaintiff's replacement cost valuations as the measure of damages as to her non-antique, non-portrait items of personal property. For that reason I cannot award damages for these items due to the failure of proof of market value.

Based on the above stated formula I find that the plaintiff's personal property damages are as follows:

| | |
|---|---|
| Antiques——————— | $14,005.00 |
| Non–Antiques————— | $0.00 |
| Portraits——————— | $9,703.16 |

### Damage to Real Estate

The measure of damages to the realty of the plaintiff is the cost of repairing or restoring the property in kind and quality. *L Investments, Ltd. v. Lynch,* 212 Neb. 319, 322 N.W.2d 651 (1982). There appears to be no question of fact as to whether the cost of repairing or restoring the property exceeds the market value of the property just before the damages, and the defendant did not challenge the plaintiff's evidence tending to show that the house could be repaired or restored.

Plaintiff's witness Gary Schaub, a fire and water damage restoration contractor, testified by deposition that his estimate of repair and restoration of the Meisner home amounted to a total of $123,220.04. I agree with the defendant, however, that a few of the repairs contemplated by Mr. Schaub would be an improvement over and above mere restoration and will reduce his estimate by the following:

34 additional yards of carpeting at an average cost of $20.00 per square yard— Reduction of $680.00

The lesser of the two electrical estimates—Reduction of $1,600.00

The defendant also challenged the addition of a forced air furnace which would have replaced the baseboard, hot water heating formerly in the house. However, the defendant did not offer proof of the cost of replacing a baseboard heating system and therefore no reduction in value is possible. In addition, the estimate must be reduced by the $7,000.00 received by plaintiff when she sold the realty before repairs were completed. Based on the estimate of Mr. Schaub, less the above noted deductions, the damages to real property are $113,940.04.

The plaintiff also seeks damages for the value of the loss of use of her property based on the necessity of finding additional accommodations for herself and the other members of her family. Such damages for loss of use are proper under Nebraska law. *See, L Investments, supra; Chlopek, supra.* The evidence supports the plaintiff's allegations of expenses for alternative accommodations, with the exception of $390.00 of the $520.00 in expenses owed to plaintiff's brother-in-law, which I find to be excessive under the circumstances. I find that the plaintiff's damages for loss of use are $5,684.46.

I therefore conclude, based on the above stated findings, that judgment should be

entered for the plaintiff in the amount of $143,332.66, plus the costs of this action.